## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WILLIAMS & CONNOLLY LLP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:13-cv-00396 (RBW) |
| | ) |
| OFFICE OF THE COMPTROLLER OF THE CURRENCY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S OPPOSITION TO PLAINTIFF WILLIAMS & CONNOLLY'S MOTION FOR SUMMARY JUDGMENT AND POINTS AND AUTHORITIES IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF THE OFFICE OF THE COMPTROLLER OF THE CURRENCY**

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

_____/s/_____
CLAIRE WHITAKER, D.C. Bar #354530
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7137
Claire.Whitaker@usdoj.gov

Attorneys for Defendant

*Of Counsel*

Horace G. Sneed
Litigation Director
Gregory F. Taylor
Assistant Director
Office of the Comptroller of the Currency
Counsel for the Comptroller of the Currency

## I.    **OVERVIEW OF THE CASE**

In its opening brief, Plaintiff Williams & Connelly LLP ("W&C" or "Plaintiff") has effectively *narrowed* its FOIA request to "documents related to the OCC's *definition* of independence for the outside consultants."  ECF No. 10 (Plaintiff's Motion) at 1 (emphasis added).  Defendant the Office of Comptroller of the Currency ("OCC") has already disclosed this narrow set of records to Plaintiff.   Among its disclosures, the OCC provided W&C with a two-page document entitled Independence Guiding Principles that contains the independence standards the OCC applied when it assessed the sufficiency of the independence of consultants and counsel proposed to carry out work on the Independent Foreclosure Review ("IFR") as well as other documents explaining how the OCC vetted proposed consultants and counsel.  *See* ECF No. 9 (Defendant's Motion) at Ex. 1 (Walker Decl.) at Ex. D, pp. 3-12.[1]  As explained by OCC attorney Monica A. Freas in the attached declaration (hereinafter "2d Supp. Freas Decl." ("Ex. 1")), the OCC prescribed no independence standards or definitions in the IFR other than those reflected in the documents that the OCC has already produced.  If, as Plaintiff asserts, its FOIA request is narrowly seeking only the *definition* of independence for consultants on the IFR, then the OCC has granted Plaintiff's request in full, *see id.*, and dismissal of this lawsuit is appropriate.

Plaintiff's FOIA request as drafted, however, is much broader than Plaintiff's explanation of it in its opening brief.  In addition to the definition of independence, Plaintiff's  FOIA request also seeks "documents and/or records *relating to determining* whether *any particular independent consultant* participating in the Consent Order Foreclosure Review was or was not independent within the meaning of the scope of the Consent Order Foreclosure Review." Compl. (ECF No. 1) at pp. 2-3, ¶ 1 (emphasis added).  Pursuant to three of FOIA's nine exemptions, the

---

[1] This opposition/response brief utilizes the abbreviations defined in Defendant's opening brief filed as ECF No. 9.

agency properly withheld records reflecting confidential disclosures of consultants and counsel proposed by the Banks to carry out work on the IFR required under the Consent Orders, and intra and inter-agency deliberations on the sufficiency of the proposed consultants' and counsels' independence.   The OCC has rightfully refused to disclose documents related to *determining* the sufficiency of *particular consultant's* independence.   The OCC has reasonably construed these records as responsive to the FOIA request and has, in its motion papers and accompanying declarations, met its burden to explain its reasons for withholding them.   *See* ECF No. 9 at Ex. 4 (Supp. Freas Decl.) ¶ 6 (describing the withheld materials as consisting of "bank examination related materials; confidential inter-agency or intra-agency deliberative or policy making process materials or privileged OCC attorney work-product or attorney-client communications; and/or privileged or confidential commercial or financial information obtained from the Banks or proposed consultants or counsel for the purpose of vetting the independence of the consultants and counsel for engagement on the IFR") and Rev. App. A (further describing the withheld files).

In addition, in its opening brief, W&C takes the untenable position that the withheld documents (which have been rendered unresponsive by W&C's narrowing of its FOIA request) are public records that the OCC must disclose pursuant to FOIA.   W&C is simply wrong.   *All* of the withheld records relate to the OCC's continuous process of supervision of the Banks subject to the IFR and are thus categorically exempted from FOIA's disclosure requirements pursuant to Exemption 8 as materials related to bank examination.   5 U.S.C. § 552(b)(8).   Moreover, the withheld records are also exempt, in whole or in part, under Exemptions 4 and 5.   5 U.S.C. § 552(b)(4) & (b)(5).   The process of vetting proposed consultants and counsel and ferreting out potential conflicts of interest was one that required the Banks, consultants, and law firms to make

privileged and confidential disclosures of their past engagements and representations among other privileged and confidential commercial information.  The OCC and other federal regulators, in turn, deliberated over this information, internally and among one another, prior to approving Banks' selections of consultants and selections of counsel.  FOIA simply does not require disclosure of records of this nature.  Indeed, the relevant public policy considerations underlying FOIA forbid disclosure of the withheld records.

Because the OCC has shown that it properly invoked Exemptions 4, 5, and 8, there is "no genuine issue of material fact" present in the case and the OCC is entitled to an award of summary judgment as a matter of law.  *See* Fed. R. Civ. P. 56.[2]

## II.      <u>ARGUMENT</u>

### A.  <u>Summary of Argument</u>

The OCC disclosed to Plaintiff the records containing the independence standards that the OCC[3] prescribed in determining whether consultants and counsel proposed for engagement on the IFR were sufficiently independent.  *See* Attachments to Letter from Richard C. Stearns, Acting Deputy Chief Counsel, OCC to Andrew Elliot dated December 6, 2012 found at Ex. 1 (Walker Decl.) Ex. D; *see also* Ex. 1 (2d Supp. Freas Decl.) ¶¶ 6-10.  According to Plaintiff, this is the only information that it seeks; therefore, the Court should dismiss this action as moot.  *See Ackerly v. Ley*, 420 F.2d 1336, 1340 (D.C. Cir. 1969) (once the records are produced "the lawsuit has lost its substance . . ." The relief sought "is compelled disclosure and that has been rendered moot by the disclosure").

---

[2] Should the Court determine that *in camera* review is necessary, the OCC will take the necessary steps to provide the withheld records to the Court under seal.

[3] As described in the Kurtin Declaration, ECF No. 9 at Ex. 5, the Office of Thrift Supervision ("OTS") carried out some evaluations of proposed consultants' independence prior to OTS's merger with the OCC in July 2011. Throughout this brief, references to the OCC are intended to be inclusive of OTS as a predecessor entity to the OCC where appropriate.  *See* ECF No. 9 at 4, n.2 (detailing statutory basis for merger).

Among the documents the OCC disclosed to Plaintiff are joint-agency guidance from the OCC, OTS, and Federal Reserve Board concerning independence, issued May 20, 2011, *see* Ex. 1 (2d Supp. Freas Decl.) ¶ 7, and a two-page document entitled Independence Guiding Principles, labeled draft as of June 14, 2011, which details the types of ongoing and past work which would bar a consultant from work on the IFR, such as "[p]ast work related to foreclosure . . . if the [c]onsultant is reviewing its prior work." ECF No. 9 at Ex. 1 (Walker Decl.) Ex. D. As for law firms proposed to act as independent counsel, the OCC deemed "[p]ast work in a representation or advocacy role <u>for the Bank</u> on foreclosure issues" or certain "[p]ast and ongoing work related to foreclosure issues by [a] proposed law firm <u>for OTHER Banks</u>" to bar a law firm from acting as independent counsel, for example. *Id.* (emphasis in original).

The OCC also provided Plaintiff with the testimony of Julie L. Williams, former OCC First Senior Deputy Comptroller and Chief Counsel, before the Subcommittee on Housing, Transportation, and Community Development of the Senate Committee on Banking, Housing, and Urban Affairs on December 13, 2011. *Id.* In her testimony, Ms. Williams indicated that in the process of reviewing the independence of consultants, the OCC "focused particularly on situations where consultants and law firms may have previously expressed positions on the issues on which they would be called upon to express independent judgment in the foreclosure review process." *Id.* In the same testimony, Ms. Williams reviewed the process requirements imposed by the OCC to ensure independence of the consultants *vis a vis* the mortgage servicers who hired them to fulfill the terms of the Consent Orders related to the IFR. *Id.*

On May 24, 2012, as revealed in another two-page document the OCC disclosed to Plaintiff, independent consultants retained on the IFR were informed by memorandum from Larry Hattix, OCC Ombudsman, that future engagements that involved review of loans and

practices implicated by the IFR were required to be formally vetted and approved by the OCC. *Id.*  In particular, the OCC announced that in making independence determinations it would weigh factors including potential conflicts of interest posed by work involving issues or practices related to those upon which the independent consultants were rendering judgments in connection with the IFR.  *Id.*

Through these disclosures, the OCC has granted Plaintiff's request for records "relating to the OCC's standards of independence within the meaning of the scope of the consent order foreclosure review pursuant to the April 13, 2011 Consent Orders," part 1(b) of Plaintiff's FOIA request.[4]  *See* Ex. 1 (2d Supp. Freas Decl.) ¶¶ 7-9.  The withheld records, in contrast, are responsive to part 1(c) of Plaintiff's FOIA request which sought records "relating to determining whether any particular independent consultant participating in the Consent Order Foreclosure Review was or was not independent within the meaning of the scope of the Consent Order Foreclosure Review."  *See* Ex. 1 (2d Supp. Freas Decl.) ¶¶ 10-11.  If, as Plaintiff states, its request is no longer so broad as to seek documents reflective of independence determinations, then the Court may rule in favor of the OCC without reaching analysis of the applicability of the FOIA exemptions invoked by the OCC.  Regardless of how Plaintiff reformulates its FOIA request, as more fully set forth below, the OCC has properly applied Exemptions 4, 5, and 8 with respect to the withheld records and is entitled to summary judgment.

---

[4] No records exist responsive to part 1(a) of the FOIA request.  *See* ECF No. 9 at 26, n.16.  Plaintiff explicitly withdrew its request for documents responsive to the second and third categories of documents described in the FOIA request dealing specifically with Aurora Bank, Allonhill, Promontory, and Wells Fargo.  *See* ECF No. 1 (Compl.) at p. 3, ¶ 1, n.2.  Although Plaintiff abandoned this portion of its original FOIA request when it initiated this litigation, Plaintiff's arguments continue to focus on irrelevant factual matters related to Allonhill throughout its opening brief.  *See, e.g.*, ECF No. 10 at 2, 3, and 12.

**B.** **Courts Broadly Apply Exemption 8 Which, by Its Plain Meaning, Exempts the OCC's Withheld Records from Disclosure.**

The narrow interpretation of Exemption 8 that Plaintiff urges upon the Court is contrary to both the plain meaning of the statute and established case law interpreting the exemption. *See* 5 U.S.C. § 552(b)(8) (excluding from FOIA's disclosure requirements matters that are "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions"). The Courts have repeatedly resisted Plaintiff's reading, holding instead that the *related to* language of Exemption 8 is to be broadly rather than narrowly construed. *See Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 37-38 (D.D.C. 2011) ("While FOIA exemptions are normally construed narrowly, it is recognized in this Circuit that Exemption 8's scope is 'particularly broad.'"); *McKinley v. FDIC*, 744 F. Supp. 2d 128, 143 (D.D.C. 2010) ("Although generally FOIA exemptions are to be 'narrowly construed,' it is well-established that Exemption 8's scope is 'particularly broad.'"); *see also Gregory v. FDIC*, 631 F.2d 896, 898 (D.C. Cir. 1980) (Exemption 8's "broad, all-inclusive scope should be applied as written since Congress ha[s] 'intentionally and unambiguously' so contemplated.") (quoting *Consumers Union of U.S., Inc. v. Heimann*, 589 F.2d 531, 533 (D.C. Cir. 1978)). Because the withheld records are "logically connected" to the OCC's examination of the Banks, the records are captured by the "wide net of non-disclosure" created by Exemption 8. *Public Investors Arbitration Bar Ass'n v. S.E.C.*, 11-cv-2285, 2013 WL 987769, at *5 (D.D.C. March 14, 2013).

1. *The Independence Vetting Documents Are Records "Related to" Bank Examination and Are Exempt.*

Courts have ruled in favor of application of Exemption 8 to withhold a variety of types of documents related to bank examination including records analogous to the ones at issue in this case. In two cases in particular, the courts of this Circuit have approved of the withholding of

7

records related to evaluations of fairness and transparency in connection with parties closely

involved in the functioning of regulated entities.  In *Public Investors Arbitration Bar*

*Association*, the district court ruled in favor of the SEC withholding documents related to a

regulated entity's selection of <u>third-party arbitrators</u> in the regulated entity's arbitration program

pursuant to Exemption 8.  *See* 2013 WL 987769, at *2 (describing the records requests at issue in

that case).  In another case, the DC Circuit upheld the district court's ruling that notes and

memoranda of SEC officials drafted in connection with meetings with brokerage houses and

self-regulatory organizations and concerning possible conflicts of interest on the part of

<u>securities analysts</u> were exempt from disclosure pursuant to Exemption 8.  *Bloomberg v. SEC,*

357 F. Supp. 2d 156,170 (D.D.C. 2004).  Like in these two cases, the OCC engaged in evaluation

of the conflicts of interest of parties distinct from the regulated entity itself (consultants and law

firms) as part of its supervision of financial institutions (the Banks subject to the IFR).

More generally, courts have ruled that documents related to enforcement actions brought

by financial industry regulators are within the scope of Exemption 8.  *See Atkinson v. FDIC*, 79-

cv-1113, 1980 WL 355660, at *2 (D.D.C. Feb. 13, 1980) (rejecting Plaintiff's argument that

documents related to a cease and desist order were "too tenuously related to examination reports

to be exempt because they issue after the examination"); *see also Abrams v. OCC*, No. Civ.A.

3:05-CV-2433, 2006 WL 1450525, at *4 (N.D. Tex. May 25, 2006) (enforcement action

documents are "related to" an exam report; agency need not show a "direct connection").  Thus,

Plaintiff's assertion that the withheld documents must be disclosed because the enforcement

actions against the Banks are a "separate process" from examination, ECF No. 10 at 7, is without

merit.  As a matter of OCC procedural policy and practice, the supervisory process involves

ongoing examination to ensure compliance with the requirements of enforcement actions.  *See*

ECF No. 9 at 14-16 (explaining the relationship between the OCC examination and enforcement

functions in the supervision of national banks and federal savings associations with reference to

relevant portions of the Comptroller's Handbook, Bank Supervision Process, September 2007

(Updated September 2012 for BSA/AML only)[5]).  In the context of the Consent Orders at issue

in this case, the OCC's enforcement actions were a result of and follow-up to the bank

examinations that identified deficiencies in mortgage foreclosure practices.  *Id.*; *see also* ECF

No. 9 at Ex. 3 (Freas Decl.) ¶ 3.  Indeed, Plaintiff's depiction of the examination and

enforcement history of Aurora Bank in its opening brief, ECF No.10 at 7, reflects the

interrelatedness of the bank examination process and OCC enforcement actions.

   2. *Regardless of Whether the Withheld Records Are Related to Proposed Consultants, They Are Also Related to Bank Examination and Are Exempt.*

Plaintiff argues that Exemption 8 does not cover all of the withheld records because they

are not all about financial institutions and include materials related directly to independent

consultants, not directly related to banks.  *See* ECF No. 10 at 8.  Exemption 8, however, is not

limited in the way Plaintiff contends.  Exemption 8, rather, protects records from disclosure that

were "prepared by, on behalf of, or for the use of" the OCC which are "related to examination,

operating, or condition reports."  *See* 5 U.S.C. § 552(b)(8).  The exemption does not contain a

test of *direct relatedness* to a bank or bank examination; rather it requires *relatedness,* which, as

discussed above, is interpreted broadly.  Plaintiff's assertion to the contrary is incorrect.  The

statute, furthermore, does not limit the scope of Exemption 8 to records generated by a regulated

entity, or generated by the OCC.  *See Marriott Employees' Federal Credit Union v. National*

*Credit Union Admin.*, No. Civ. A. 96-478-A, 1996 WL 33497625, at *6 (E.D. Va. Dec. 24, 1996)

---

[5] See pages 29 and 46 of the Bank Supervision Handbook, explaining how examiners recommend enforcement actions based on examination findings and engage in the on-going process of bank supervision by monitoring banks and ensuring the correction of deficiencies, available at *http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/banksupervisionprocess.pdf*

(rejecting argument that withheld documents were not exempt because they were not prepared by the regulated financial institution; documents were prepared "on behalf" of the agency within the meaning of Exemption 8).

In this case, the documents prepared "on behalf" of the OCC and provided to the OCC by Banks and proposed consultants and counsel were closely related to the supervision of financial institutions.  After the Banks subject to the IFR proposed consultants and legal counsel, the OCC undertook an analysis of the independence of the proposed companies and firms.  In this way, the OCC was examining the selections of the Banks as part of supervising the Banks' compliance with the terms of the Consent Orders.[6]  Whether the Banks generated the documents or communicated them directly to the agency is of no significance in the application of Exemption 8.  The independence evaluations required the OCC to consider previous and current engagements and representations of the proposed consultants and firms in order to assess potential conflicts of interest which would impact the ability of the consultants and firms to independently perform work on the IFR for the Banks.  Although these disclosures certainly included reports of work done for clients other than the Banks subject to the IFR, these

---

[6] The principle that evaluation of a bank's selection of a service provider is subject to the examination and approval of the OCC has analogues in other aspects of OCC supervision.  Pursuant to Section 914 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), certain banks must "notify the appropriate Federal banking agency [*i.e.* the OCC] of the proposed addition of any individual to the board of directors or the employment of any individual as a senior executive officer of such institution or holding company at least 30 days . . . before such addition or employment becomes effective." 12 U.S.C. § 1831i(a).  The appointment is subject to OCC disapproval, "if the competence, experience, character, or integrity of the individual with respect to whom such notice is submitted indicates that it would not be in the best interests of the depositors of the depository institution or in the best interests of the public to permit the individual to be employed by, or associated with, the depository institution or depository institution holding company." 12 U.S.C. § 1831i (b), (e).  Although the Section 914 approval process involves review and deliberation over information provided by and about the proposed bank director or officer, it is nevertheless part of the continuous process of supervision of the bank proposing the appointment.

disclosures were made in the context of the OCC's supervisory process for the purpose of promoting the safety and soundness of the Banks subject to the IFR.[7]

3. *Application of Exemption 8 in this Case Does Not Promote Administrative Secrecy; Rather, It Advances the Legitimate Governmental Interests Protected by Exemption 8.*

The OCC's application of Exemption 8 to the withheld records at issue in this case as materials related to bank examination is fully supported by the authority cited above. Unable to establish that the withheld records fall outside the broad category of documents contemplated by Exemption 8, W&C declaims that the OCC seeks "limitless power to protect all of its files from disclosure" and "carte blanche to operate in complete secrecy," threatens to "render [Exemption 8] limitless," and attempts to "shield" "a body of secret law." ECF No. 10 at 1, 7, 9, and 13. But courts have not been persuaded to rewrite FOIA and limit the scope of Exemption 8 based on such rhetoric. *See, e.g., Public Investors Arbitration Bar Ass'n*, 2013 WL 987769, at *7 (rejecting plaintiff's argument that the SEC's application of Exemption 8 "allowed the agency to act as a functional vacuum cleaner into which all manner of nonexempt documents would be shielded from scrutiny.").

More importantly, the OCC released to Plaintiff the Independence Principles applied to consultants and counsel proposed for the IFR and other documents that serve to explain the OCC's process for vetting consultants and counsel. *See supra* pp. 5-6 (describing disclosed documents). By these disclosures, the agency has provided transparency and openness to the fullest extent possible without compromising the serious governmental and private interests implicated by the claimed exemptions. For example, the OCC's assertion of Exemption 8 in this

---

[7] Even if Exemption 8 contained a test of *direct relatedness*, requiring withheld records to directly reflect the business of a supervised financial institution (which it does not), the OCC would have justifiably applied the exemption. The Banks subject to the IFR were effectively employing the consultants and the counsel as their agents or affiliates in order to bring in resources and perspective to properly perform the IFR. In other words, because the consultants and counsel functioned *for* the Banks in conducting the IFR, evaluation of the independence of these entities was effectively an evaluation of the Banks.

case fulfills Congress's intent to preserve open and frank communications between the OCC and its regulated entities.  *See* ECF No. 9 at 13, 16-17; ECF 9 at Ex. 3 (Freas Decl.) ¶ 26 (attesting that the OCC "depends on receiving the cooperation of and forthright, frank, and open communication with its regulated entities . . . The ability to engage in the examination and supervisory process and share and discuss examination findings in both the supervisory and enforcement context without making communications and related documents public is crucial to the success of the OCC's mission of ensuring a safe and sound national banking system.").

It is well established law that a purpose of Exemption 8 is to "safeguard the relationship between the banks and their supervising agencies." *Consumers Union of U.S., Inc. v. Heimann*, 589 F.2d 531, 534 (D.C. Cir. 1978) ("If details of the bank examinations were made freely available to the public and to banking competitors, there was concern that banks would cooperate less than fully with federal authorities.").  Public disclosure of the independence vetting and determination documents would risk dissuading banks and parties affiliated with them from being fully forthcoming when disclosures of potential conflicts of interest are required in the future.  *See* ECF No. 9 at 16-17 (addressing the purpose of Exemption 8) & 20-21 (citing *Washington Post Co. v. U.S. Dept. of Health and Human Services*, 690 F.2d 252, 268-69 (D.C. Cir. 1982) (within the context of Exemption 4, reasoning that the obligation to disclose potential conflicts of interest could be interpreted more narrowly if the party making the disclosure fears public release of the information)).[8]

In support of its accusation that the OCC is attempting to act in unlawful secrecy, Plaintiff cites an unpublished opinion in a reverse-FOIA case from the District of New Mexico

---

[8] The OCC, however, does not bear the burden of proving that the congressional objectives behind Exemption 8 are met by the particular withholdings at issue in this case.  *See Heimann*, 589 F.2d at 538 (J. Skelly Wright concurring) ("I concur with the court that appellant must fail in its effort to recast Exemption 8 from a provision that looks to the nature and source of material into one that focuses on the likely consequences of disclosure.").

for the proposition that application of Exemption 8 should be disallowed when it would "shield everything that 'might be reviewed in the process of bank examination.'"  *See* ECF No. 10 at 9 (citing *Forest Guardians v. U.S. Forest Serv.*, No. Civ. 99-614M/KBM, 2001 U.S. Dist. LEXIS 26121, at *85 (D.N.M. Jan. 29, 2001)).  But the concerns at issue in *Forest Guardians* are not present here.[9]  The *Forest Guardians* Court discussed application of Exemption 8 in the context of deciding an intervenor's partial motion for summary judgment against the Forest Service.  *Id.* at *75-96.  The Court declined to find that the Forest Services's release of escrow waivers[10] in response to a FOIA request unlawful because, *inter alia*, Exemption 8 did not protect the documents from disclosure.  *Id.* at *84-86.  The Court rejected the intevenor's characterization of Exemption 8 as shielding the escrow waivers simply because a regulator of financial institutions, the Farm Credit Administration, might have viewed them in its capacity as the regulator of Farm Credit Banks.  *Id.*  Unlike the intervenor in *Forest Guardians*, the OCC is not claiming that Exemption 8 protects from disclosure all documents created or obtained by a bank in its course of business for the sole reason that OCC examiners may view them in the course of the supervisory process.  *Forest Guardians* is inapposite to the present case.[11]

---

[9] In *Forest Guardians*, certain Forest Service regional offices withheld some or portions of escrow waivers ("uniform federal forms prepared by lenders at the request of the Forest Service to record the use of [] federal grazing permit[s] as collateral to secure [] loan[s]") in response to a FOIA request.  2001 U.S. Dist. LEXIS 26121, at *4.  Forest Guardians sued and the agency entered a settlement agreement to release additional escrow waivers.  *Id.* at *9.  Before production, third parties including ranchers, their lenders, and wholesale lenders intervened to oppose disclosure out of concern for the irreparable harm that would come to the permittees and the Farm Credit System by disclosure of the private, confidential, and commercial information contained in the escrow waivers.  *Id.* at *9-10.  The intervenors had no cause of action under FOIA; their complaint concerning disclosure of the escrow waivers was heard pursuant to the Administrative Procedures Act.  *Id.* at *27-28.

[10] See *supra* n.9.

[11] Plaintiff quotes the testimony of OCC Deputy Chief Counsel Daniel P. Stipano where he characterized confidential supervisory information as that which would "reveal examination techniques, examination strategies, or the iterative process between examiners and the bank."  *See* ECF No. 10 at 10.  As an initial matter, Mr. Stipano was not speaking in this testimony about the application of Exemption 8 to records related to independence vetting.  *See* ECF No. 9 at Ex. 2 (Supp. Walker Decl.) Ex. A, p. 9 of the transcript of Deputy Chief Counsel Daniel P. Stipano's oral testimony before the Senate Banking, Housing and Urban Affairs Subcommittee on Oversight of Independent Consultants in Financial Services (Apr. 11, 2013).  But more importantly, the withheld records in this case are

**C.  The OCC's Declarants Have Provided Sufficient Information to Justify Summary Judgment in the Agency's Favor on Exemption 8.**

In processing W&C's administrative appeal of the initial denial of the FOIA request, the OCC segregated all of the documents that pertain to the definition of independence and independence considerations generally and produced those documents.  *See supra* pp. 5-6 (describing produced documents); ECF No. 9 at 8-9; Ex. 1 (2d Supp. Freas Decl.) ¶¶ 6-9.  The remaining withheld documents reveal confidential information related to the examination of individual financial institutions.  *See* Ex. 1 (2d Supp. Freas Decl.) ¶ 10.  Plaintiff repeatedly characterizes the agency's description of the documents withheld as "boiler plate" and "conclusory," "littered with ambiguity," and reflective of "scattershot" categorization of documents and a "kitchen-sink approach."  *See, e.g.*, ECF No. 10 at 1, 6, 7, and 16.  But nowhere does Plaintiff state what information is lacking.  In fact, a reading of the description of the documents contained in the Revised Appendix A, ECF No. 9 at Ex. 4 (Supp. Freas Decl.), reveals that the OCC's declarants have provided sufficient information for the Court to find that the withheld materials are related to bank examination and are properly withheld under Exemption 8.

1. *A Traditional, Detailed Vaughn Index Is Not Required to Justify Application of a Categorical Exemption Such as Exemption 8.*

Exemption 8 shields from disclosure the broad category of documents related to bank examinations.  The OCC bears the burden of showing that the withheld records fall within that category.  Courts have held that an agency may fulfill that burden with declarations, like those provided by the OCC's declarants, and need not resort to a traditional, detailed *Vaughn* Index.  *See* ECF No. 9 at 29-31.  When "a claimed FOIA exemption consists of a generic exclusion,

---

related to independence vetting and *would* reveal examination techniques, examination strategies, and the iterative process between examiners and the bank for all the reasons stated *supra* pp. 7-11.

dependent upon a category of records rather than the subject matter which each individual record contains," such as Exemption 8's categorical coverage of documents related to bank examination,  "resort to a *Vaughn* Index is futile."  *See Church of Scientology of Cal. v. IRS,* 792 F.2d 146, 152 (D.C. Cir. 1986).  An agency's declarants can provide the Court the requisite "reasonable basis" to conclude that the withheld documents are related to bank examination.  *See Public Investors Arbitration Bar Ass'n*, 2013 WL 987769, at *12 (citations omitted); *see also Archibald v. U.S. Dept. of Justice*, 11-CV-2018, 2013 WL 2948212, at *6 (D.D.C. June 17, 2013) (index not required when category of documents are exempt) (citing *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 766 (D.C. Cir. 2000)).

The cases Plaintiff cites to attack the sufficiency of the OCC's declarations are inapplicable to the matter at hand as they do not arise in the context of application of Exemption 8 specifically or  application of any other exemption using a categorical approach. Moreover, in none of the cases did the court provide the remedy of ordering disclosure due to insufficient information from the agency declarants; instead the agencies were required to provide the court additional detail.  *See Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1184 (D.C. Cir. 1996) (requiring on remand that the National Security Agency "submit an index describing the withheld documents to the greatest extent possible without disclosing information that must be protected" to determine application of Exemptions 1 and 3); *King v. U.S. Dep't of Justice*, 830 F.2d 210, 226 (D.C. Cir. 1987) (remanding to the district court to "scrutinize afresh the FBI's assessment of the consequences of disclosure" either by requiring supplemental declarations in support of application of Exemption 1  or *in camera* inspection); *Wiener v. F.B.I.*, 943 F.2d 972 (9th Cir. 1991) (remanded for creation of adequate *Vaughn* Index to justify application of Exemptions 1, 3, and 7).

As for *Coastal States Gas Corp. v. Dep't of Energy*, the appellate court did not affirm the district court's order to produce documents simply because of the inadequacy of the *Vaughn* Index; the court determined that Exemption 5 was inapplicable based on the content of the *Vaughn* Index and the review of documents in the record. 617 F.2d 854, 869 (D.C. Cir. 1980) ("We are unable to conclude . . . that these regional counsel opinions possess any of the characteristics normally displayed by memoranda protected by the deliberative process privilege. . . . The evidence strongly supports the district court's conclusion that, in fact, these opinions were routinely used by agency staff as guidance in conducting their audits, and were retained and referred to as precedent."). In contrast to the agency defendants in the cases cited by Plaintiff, the OCC, through its declarants, has provided a reasonable basis in support of exempting the withheld records based on their relation to the bank examination process.

2.  *Attorney Freas' and Attorney Kurtin's Declarations Provide the Requisite Reasonable Basis for Application of Exemption 8.*

The descriptions of the withheld records offered by the OCC are not boilerplate or conclusory. Rather, they reflect a review of all of the withheld records and contain sufficient detail to provide the requisite reasoned basis for applying Exemption 8, without revealing information that Exemption 8 is intended to shield from public disclosure. In their declarations, Ms. Freas and Ms. Kurtin describe the relatedness of the independence vetting process to the IFR, the Consent Orders, and the OCC's continuous process of the supervision of national banks and federal savings associations. *See* ECF No. 9 at 30, Ex. 3 (Freas Decl.) ¶¶ 3, 6 and Ex. 5 (Kurtin Decl.) ¶ 5.

As reflected in the Revised Appendix A to the Supplemental Freas Declaration (June 25, 2013), ECF No. 9 at Ex. 4, the withheld documents are organized in files containing independence vetting materials related to consultants and counsel proposed by *more than one*

Bank (File Nos. 1, 2, 13-15) and files containing independence vetting materials related to

consultant and counsel proposed by *one individual* Bank (File Nos. 3-11).  In addition, the OCC

interpreted the FOIA request to be seeking the engagement letters between independent counsel

and independent consultants (File No. 12) and to be seeking documents related to the termination

of one of the independent consultants (File Nos. 16-17).

Each of these files was reviewed page-by-page and the descriptions provide as much

detail as is needed to show that the files contain material related to the supervision of particular

Banks.  The OCC performed its segregation analysis and released the responsive general policy

documents connected to the definition of independence that do not reflect the supervision of

particular Banks.  *See supra* pp. 5-6 (describing produced documents).  The withheld documents

are not general policy documents; as the descriptions of the files in Revised Appendix A

indicate, the withheld records reflect the evaluation of particular consultants and counsel

proposed to perform work on the IFR for particular Banks.  *See* Ex. 1 (2d Supp. Freas Decl.) ¶¶

6-10.  The files of withheld records contain, for example:

- Emails "summarizing status of evaluations" of particular consultants (File No. 1)
- Emails regarding "the status of independence determinations" with respect to particular consultants and counsel (File No. 2)
- Communications with Banks and their proposed consultants and counsel including confidential disclosures of previous work and engagements to the OCC (File Nos. 3-11, 14-15)
- Engagement letters between counsel and consultants required by the OCC and marked confidential  (File No. 12)
- Emails among OCC and OTS attorney and supervisory employees "discussing the consideration and rejection of proposed independent consultants" (File No. 13)

ECF No. 9 at Ex. 4 (Supp. Freas. Decl.) at Rev. App. A.  The Plaintiff labels the descriptions

provided in this 13-page chart as "boiler plate."  The similarities in the descriptions across files,

however, reflect only that the process of vetting consultants required obtaining the same type of

information from the consultants and counsel proposed by the multiple Banks subject to the IFR. As reflected in the record, *see supra* p. 5, the OCC had specific guiding principles and processes that resulted in exchanging communications with Banks, proposed consultants, and proposed counsel. The disclosures contained in these communications were then the subject of agency deliberative processes with respect to each particular Bank. It should be no surprise that the descriptions of the documents for files for individual Banks will be largely similar, but they are nevertheless accurate and are the result of individual file reviews.

Providing any additional information about the documents in the withheld files would be useless (and potentially contrary to law or public policy) because no information that might conceivably be stated about these documents would remove Exemption 8 protection. Simply put, these documents, materials reflecting the OCC's determinations of independence for consultants and counsel proposed for work on the IFR, are related to examination of specific Banks. Plaintiff has suggested no possible missing detail that would remove the documents from the category of documents covered by Exemption 8 or, for that matter, provide the Court with further clarity confirming the application of Exemption 8. Given the categorical nature of Exemption 8, the OCC's descriptions of the withheld material are more than sufficient to allow the Court to award summary judgment to the agency. *See, e.g., Public Investors Arbitration Bar Ass'n*, 2013 WL 987769, at *13 (when "scope of the plaintiff's FOIA request necessarily renders all potentially responsive materials exempt from disclosure under Exemption 8," "sworn declaration [summarizing] the agency's search efforts and explain[ing] both the nature of the withheld documents and the factual basis for withholding those documents categorically under Exemption 8" was sufficient).[12]

---

[12] Plaintiff complains that the OCC has not performed a full review of 46 MB of electronic data containing some responsive and also duplicative material related to independence determinations. This issue raises a question of the

### D.  **The OCC Has Properly Invoked Exemptions 4 and 5.**

Having established that the OCC has rightfully withheld all of the records at issue

pursuant to Exemption 8, the Court need not reach consideration of Exemptions 4 and 5 in order

to award summary judgment to the OCC.  *See Consumers Union of U.S., Inc. v. Heimann*, 589

F.2d 531, 533, n.7 (D.C. Cir. 1978) ("Because of the result we reach concerning exemption 8, we

find it unnecessary to address the Comptroller's other claims of exemption.")  Nevertheless, the

OCC has properly invoked these two additional applicable exemptions before the district court.

*See Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 764 (D.C. Cir. 2000) ("We have plainly and

repeatedly told the government that, as a general rule, it must assert all exemptions at the same

time, in the original district court proceedings.") (collecting cases).[13]  As in this case, in *Maydak*

the DOJ withheld records based on a categorical exemption.  *Id.* at 765 ("the DOJ satisfies its

burden of proof under Exemption 7(A) by grouping documents in categories and offering generic

reasons for withholding the documents in each category").  On appeal of a court order to produce

the documents, the DOJ sought a remand to the district court to assert additional exemptions.

The DOJ maintained that, if it were required to have asserted the other exemptions previously,

simultaneously with Exemption 7(A), it would have "be[en] forced to produce a Vaughn index . .

---

adequacy of the OCC's search, not a critique of the sufficiency of the detail of declarations.  *See Public Investors Arbitration Bar Ass'n*, 2013 WL 987769, at *14 (SEC's lack of document by document review of 65 boxes of "potentially responsive" documents  likely made no difference "in light of the fact that any records potentially responsive to the plaintiff's request would be categorically exempt from disclosure").  As noted by Attorney Freas, she reviewed these electronic collections of documents after already searching her email, other electronic, and paper files.  ECF No. 9 at Ex. 3 (Freas Decl.) ¶ 16.  She reviewed these electronic files and found that some but not all dealt with independence determinations and were largely duplicative of the nearly 2,000 pages of hard copy documents that she had already identified as responsive.  Based on this result of her review of the 46 MB of electronic material, it was reasonable for her to consider her identification of documents from her own files and other emails from the examination teams (as well as the searches performed by Attorney Kurtin, ECF No. 9 at Ex. 5) to constitute a reasonable search that fulfilled the OCC's obligations under FOIA.  ECF No. 9 at Ex. 3 (Freas Decl.) ¶ 20; *see also* Ex. 1 (2d Supp. Freas Decl.) ¶¶ 4-5.

[13] Plaintiff complains that the OCC did not invoke Exemption 4 during the administrative process.  But the relevant case law considers invocation of an exemption timely as long as it occurs during the district court proceedings.  *See* ECF No. 9 at 18 n.10.

. to satisfy its burden of proof with respect to the other exemptions [and] the mere act of producing a Vaughn index for the purpose of substantiating its invocation of another FOIA exemption w[ould] itself [have] disclose[d] the very information that the more generalized categorical showing required for Exemption 7(A) was designed to protect, and thereby undermine the very purposes of Exemption 7(A)." *Id.* at 765-66.

The D.C. Circuit rejected this justification for untimely invocation of the additional exemptions and rejected the argument that "the government should be allowed to start back at the beginning" after a court denies applicability of a categorical exemption. *Id.* Instead of producing a traditional, detailed *Vaughn* index, the Court of Appeals explained that the DOJ should have attempted in the district court proceedings to make a sufficient showing to support the additional exemptions through a categorical approach and make use of "mechanisms by which it can accomplish the goal of protecting sensitive information while at the same time satisfying its burden of proof with respect to other exemptions in the original district court proceedings." *Id.* at 766-67 (mechanisms include, *e.g.*, detailed affidavits, *in camera* inspection).

The OCC is following the very approach directed by the D.C. Circuit in *Maydak*. The OCC has endeavored to provide detailed declarations which provide sufficient information to show the applicability of the claimed exemptions, without "disclos[ing] the very information the government seeks to protect" by invoking the categorical protection of Exemption 8. *Id.* If the Court is disinclined to decide the case in the OCC's favor based on Exemption 8 alone and requires additional detail to determine the applicability of Exemptions 4 and 5, the OCC is prepared to provide more detailed descriptions of the withheld documents and any other information that would assist the Court, including the withheld records for *in camera* inspection if the Court deems it necessary.

1. *Exemption 4 Shields the Privileged and Confidential Commercial Information of the Proposed Consultants and Counsel from Disclosure.*

The consultants and counsel proposed for engagement on the IFR were required to make disclosures to the OCC of their past engagements and representations connected to the Banks as well as of work done for other clients related to mortgage foreclosure.  These disclosures were made not just by the consultants and counsel eventually approved by the OCC and retained by the Banks but by *all* of the consultants and counsel that the Banks proposed and the OCC vetted.  No reasonable person would disagree that these disclosures consist of "privileged or confidential"  "commercial or financial information" that 5 U.S.C. § 552(b)(4) is meant to protect from public disclosure.  Yet, Plaintiff does.

Despite W&C's protestations, the OCC has actually provided considerable detail in the Revised Appendix A to the Supplemental Freas Declaration (June 25, 2013), ECF No. 9 at Ex. 4, making clear that Exemption 4 protects the records in question.  For example:

- "letter from [Bank] to OCC providing disclosure of past engagements of proposed consultant (labeled 'confidential treatment requested/subject to 12 USC § 1828(x)')" (File No. 3)
- "letter from [Bank] to OCC providing disclosure of past engagements of proposed consultant and identifying proposed counsel (labeled 'confidential treatment requested/subject to privilege')" (File No. 4)
- "Engagement letter between counsel and consultant (labeled 'confidential & privileged from counsel')" (File No. 8)
- "2010 engagement letter between a bank and a proposed consultant describing scope of work on other matter (labeled 'Privileged & Confidential, Work Product Prepared by Counsel')" (File No. 9)
- "2011 draft engagement letter between a bank and proposed consultant (labeled 'FOIA Confidential Treatment Requested' and letter explicitly requests 'confidential treatment of these materials under sections (b)(4) and (b)(8) of [FOIA]')" (File No. 11)

ECF No. 9 at Ex. 4 (Supp. Freas Decl.) Rev. App. A.  *See Soghoian v. Office of Mgmt. & Budget*, CIV. 11-2203-RCL, 2013 WL 1201488, at *6 (D.D.C. Mar. 26, 2013) ("while the fact that the redacted documents are labeled 'DRAFT PRIVILEGED AND CONFIDENTIAL' is not

dispositive . . . it certainly suggests that the documents at issue were in fact intended to remain confidential . . .").

Many of the other documents containing disclosures are marked "confidential" or "privileged" as indicated throughout Revised Appendix A.  ECF No. 9 (Supp. Freas Decl.) Ex. 4; *see* ECF No. 9 at 18-19 (noting that, pursuant to 12 U.S.C. 1828(x)(1), disclosure of privileged information to the OCC does not result in waiver).  Many other communications, such as emails from the Banks, consultants, and counsel in response to questions emailed by the OCC, may not be marked confidential or privileged but contain similar disclosures of confidential or privileged information that warrant Exemption 4 protection.  The OCC has properly invoked Exemption 4 to protect the private and governmental interests that would be threatened by a court ordered production of the consultants' and law firms' disclosures.  *See* ECF No. 9 at 19-21 (explaining that public disclosure of the information provided to the OCC for the purpose of independence vetting would impair the quality of similar types of disclosures in the future and cause competitive harm to the proposed consultants and counsel).[14]

2. *The OCC Has Rightfully Withheld Deliberative and Predecisional Inter and Intra-Agency Communications and Other Privileged Material Pursuant to Exemption 5.*

The OCC and Plaintiff agree that Exemption 5 only protects documents that are deliberative or predecisional and does not protect communications with non-agency persons. Plaintiff, however, makes speculative claims that the OCC has misapplied Exemption 5.  The

---

[14] The imperative that federal agencies protect businesses' confidential information from public disclosure is embodied in criminal statute by the Trade Secrets Act.  *See* 18 U.S.C. 1905 ("Whoever, being an officer or employee of the United States or of any department or agency thereof, . . publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment.").

essential underpinning of Plaintiff's arguments on Exemption 5 is its assertion that the OCC *must* be attempting to hide general policy or position documents that set forth the definitions and standards for independence applied to consultants and counsel in the IFR.  This simply is not the case.  The OCC has disclosed the responsive records which reflect general policy and agency positions to Plaintiff during the administrative process.  *See supra* pp. 5-6 (describing produced documents); *see also* Ex. 1 (2d Supp. Freas Decl.) ¶¶ 6-9.  The agency is not attempting to hide its policy or position on the standards for independence.  Nor is the OCC relying on Exemption 5 to withhold any documents reflecting a final agency position or purely factual material.

It is true, as Plaintiff points out, that the files concerning independence vetting for the proposed consultants and counsel of individual banks contain documents reflecting communications with third parties as well as other documents reflecting inter and intra-agency communications, and some individual documents are reflective of both types of communications. Ex. 1 (2d Supp. Freas Decl.) ¶ 11.  These documents reflect the iterative and collaborative process of bank supervision and the open and frank communications between the OCC and its regulated entities and the necessity of discussions within the OCC of the information provided by regulated institutions.  *See generally* Comptroller's Handbook, Bank Supervision Process, September 2007 (Updated September 2012 for BSA/AML only).[15]  The nature of the way that bank supervision is conducted is not, as Plaintiff suggests by its assertions, evidence that the OCC has wrongly invoked Exemption 5.  Indeed, Exemption 5 protection of the withheld records is essential for the OCC to fulfill its mission to ensure a safe and sound national banking system and fulfillment of the purpose of Exemption 5.  *See* ECF No. 9 at 22-23.

---

[15] See pp. 29 and 46 of the Bank Supervision Handbook, explaining how examiners recommend enforcement actions based on examination findings and the on-going process of bank supervision to monitor and ensure the correction of deficiencies, available at *http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/banksupervisionprocess.pdf*

The second underpinning for Plaintiff's arguments on Exemption 5 is the notion that the OCC made some kind of waiver in a press release discussing the termination of Allonhill by stating that Allonhill's "reported work for third parties . . . [was] inconsistent with the independence requirements for independent consultants, prescribed by the OCC." *See* ECF No. 10 at 14 (quoting the OCC's press release which was among the documents produced by the OCC and available at ECF No. 9 at Ex. 1 (Walker Decl.) Ex. D at p. 15). Plaintiff appears to be arguing that, given this statement, the OCC is required to produce all documents related to the standards for independence considered by the agency in deciding to direct the termination of Allonhill.[16] As an initial matter, the argument is moot because the OCC has already released the standards articulating the requirements for independence it prescribed for the IFR. *See supra* pp. 5-6 (describing disclosed documents); Ex. 1 (2d Supp. Freas Decl.) ¶¶ 6-9. More fundamentally, there has been no waiver that would remove the protections of Exemptions 4, 5, or 8. Plaintiff singles out a legal memorandum described in the Revised Appendix A as File No. 16. *See* ECF No. 9 at Ex. 4 (Supp. Freas Decl.). Plaintiff surmises that this memo may relate to the termination of Allonhill and demands that it be produced. ECF No. 10 at 15 n.4. This document, however, constitutes privileged attorney work product and attorney client communication protected from disclosure by Exemption 5 (as well as Exemptions 4 and 8). *See* ECF No. 9 at 23-25 (discussing authority allowing the withholding of internal OCC communications with agency lawyers pursuant to Exemption 5).

Neither of the two cases cited by Plaintiff, *see* ECF No. 10 at 15, supports, or even considers, circumvention of the bank examination privilege or Exemption 8 protection, let alone

---

[16] W&C accuses the OCC of a "scattershot" approach in defending this case. But it is actually the Plaintiff moving the target. Although the Complaint explicitly abandons the portion of the original FOIA request dealing with Allonhill, Plaintiff repeatedly raises in its opening brief issues related to Allonhill's termination as an independent consultant working on the IFR. *See supra* n.4.

the attorney client privilege or the attorney work product doctrine.  The OCC is empowered under Exemption 5 to preserve the quality of its decision making and legal counseling by withholding in this case its communications reflecting the confidential provision of advice by its government attorneys as well as its attorneys' work product.  *See Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 862, 864 (D.C. Cir 1980) ([T]he purpose [of the attorney-client privilege" is to assure that a client's confidences to his or her attorney will be protected, and therefore encourage clients to be as open and honest as possible with attorneys. . . . [T]he work-product doctrine "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories" to shield "documents prepared in contemplation of litigation.").

### III.    <u>CONCLUSION</u>

For the reasons stated herein, Defendant requests that its summary judgment motion be granted.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

_____/s/_____
CLAIRE WHITAKER, D.C. Bar #354530
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7137
Claire.Whitaker@usdoj.gov

Attorneys for Defendant

*Of Counsel*
Horace G. Sneed
Litigation Director
Gregory F. Taylor
Assistant Director
Office of the Comptroller of the Currency
Counsel for the Comptroller of the Currency